70 A.3d 308

**Benjamin Morgan HAWKES**

v.

**STATE of Maryland.**

**No. 76, Sept. Term, 2012.**

Court of Appeals of Maryland.

July 22, 2013.

Clayton G. Northouse (Paul J. Zidlicky and Kurt H. Jacobs of Sidley Austin LLP, Washington, DC), on brief, for Petitioner.

Ryan R. Dietrich, Asst. Atty. Gen. (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J.,\* HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

Section 3–114 of the Criminal Procedure Article of the Maryland Code (2001, 2008 Repl. Vol.),[1] governing the eligibili-

---

\* Bell, C.J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

1. Section 3–114 states:
 (a) *In general.*—A committed person may be released under the provisions of this section and §§ 3–115 through 3–122 of this title.
 (b) *Discharge.*—A committed person is eligible for discharge from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged.
 (c) *Conditional release.*—A committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court.

ty for discharge or conditional release of patients committed to the Department of Health and Mental Hygiene (DHMH), pursuant to Section 3–112 of the Criminal Procedure Article,[2] is the focus of the present case. At issue is subsection (c) of Section 3–114, which states that, "[a] committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court." What constitutes "a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others" is one aspect of our analysis, while another is whether an individual's eligibility for conditional release must take into account conditions designed to address such risk. The specific question presented in the Petition for Certiorari, which we granted, 429 Md. 81, 54 A.3d 759 (2012), calls upon us to answer:

> Whether the statutory right to conditional release under Section 3–114(c) of the Maryland Code of Criminal Procedure requires a showing that the committed individual would not pose a risk of danger to self or the person or property of others without regard to the conditions designed to address such risk.

We shall hold that in a conditional release setting under Section 3–114(c), the determination of whether a patient poses

---

(d) *Burden of proof.*—To be released, a committed person has the burden to establish by a preponderance of the evidence eligibility for discharge or eligibility for conditional release.
Md.Code (2001, 2008 Repl. Vol), § 3–114. Unless otherwise noted, all references to Section 3–114 are to the Criminal Procedure Article, Maryland Code (2001, 2008 Repl. Vol.). Unless otherwise noted, all references to the Criminal Procedure Article of the Maryland Code are to Maryland Code (2001, 2008 Repl. Vol.).

**2.** Section 3–112 provides, in pertinent part:
(a) *In general.*—Except as provided in subsection (c) of this section, after a verdict of not criminally responsible, the court immediately shall commit the defendant to the Health Department for institutional inpatient care or treatment.

a danger to himself or others must take into account proposed conditions of release.

Benjamin M. Hawkes, Petitioner, a patient at Clifton T. Perkins Hospital Center (Perkins),[3] pled and was found not criminally responsible,[4] for the murder of two people, on

---

**3.** The Clifton T. Perkins Hospital Center is a State-run "facility" maintained by the Mental Hygiene Administration of the Department of Health and Mental Hygiene. Md. Code (1982, 2009 Repl. Vol.), § 10–406(a). Section 10–101(e) of the Health General Article, Maryland Code (1982, 2009 Repl. Vol.) defines a "facility" as "any public or private clinic, hospital, or other institution that provides or purports to provide treatment or other services for individuals who have mental disorders."

**4.** Section 3–110 of the Criminal Procedure Article governs the procedure for pleading and being found not criminally responsible for alleged criminal conduct. Section 3–110 states:

(a) *Time and manner of pleading.*—(1) If a defendant intends to rely on a plea of not criminally responsible, the defendant or defense counsel shall file a written plea alleging, in substance, that when the alleged crime was committed, the defendant was not criminally responsible by reason of insanity under the test for criminal responsibility in § 3–109 of this title.

(2) A written plea of not criminally responsible by reason of insanity shall be filed at the time provided for initial pleading, unless, for good cause shown, the court allows the plea to be filed later.

(b) *Burden of proof.*—The defendant has the burden to establish, by a preponderance of the evidence, the defense of not criminally responsible.

(c) *Degree of proof.*—If the trier of fact finds that the State has proved beyond a reasonable doubt that the defendant committed the criminal act charged, then, if the defendant has pleaded not criminally responsible, the trier of fact separately shall find whether the defendant has established, by a preponderance of the evidence, that the defendant was at the time criminally responsible or not criminally responsible by reason of insanity under the test for criminal responsibility in § 3–109 of this title.

(d) *Restriction on verdict.*—A court may not enter a verdict of not criminally responsible unless the defendant or defense counsel has filed a written plea under subsection (a) of this section.

Section 3–109 of the Criminal Procedure Article, which governs the test for criminal responsibility provides:

(a) *In general.*—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity to:

(1) appreciate the criminality of that conduct; or

(2) conform that conduct to the requirements of law.

September 4, 2001. Following the determination that Mr. Hawkes was not criminally responsible by reason of a mental disorder, he was committed to Perkins, pursuant to Section 3–112 of the Criminal Procedure Article.[5] After spending approximately seven years as a patient at Perkins, Mr. Hawkes applied for conditional release in March of 2009, pursuant to Section 3–119(b) of the Criminal Procedure Article of the Maryland Code, "request[ing] a determination of his eligibility for conditional release or discharge." [6]

---

(b) *Exclusions.*—For purposes of this section, "mental disorder" does not include an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct.

5. Section 3–112 states:
 (a) *In general.*—Except as provided in subsection (c) of this section, after a verdict of not criminally responsible, the court immediately shall commit the defendant to the Health Department for institutional inpatient care or treatment.
 (b) *Mentally retarded defendant.*—If the court commits a defendant who was found not criminally responsible primarily because of mental retardation, the Health Department shall designate a facility for mentally retarded persons for care and treatment of the committed person.
 (c) *Release.*—After a verdict of not criminally responsible, a court may order that a person be released, with or without conditions, instead of committed to the Health Department, but only if:
 (1) the court has available an evaluation report within 90 days preceding the verdict made by an evaluating facility designated by the Health Department;
 (2) the report indicates that the person would not be a danger, as a result of mental retardation or mental disorder, to self or to the person or property of others if released, with or without conditions; and
 (3) the person and the State's Attorney agree to the release and to any conditions for release that the court imposes.
 (d) *Notification of Central Repository.*—The court shall notify the Criminal Justice Information System Central Repository of each person it orders committed under this section.

6. Section 3–119 of the Criminal Procedure Article makes clear that there are two choices, from which a committed person must choose only one, by which release can be sought: an administrative hearing before the OAH or a jury trial in the circuit court. Mr. Hawkes proceeded under subsection (b), which governs the administrative procedure:
 (b) *Administrative procedure.*—(1) To apply for release under this subsection, the committed person shall file an application for release

A hearing was convened before an administrative law judge at which the issue was whether or not Mr. Hawkes could be released from the confines of Perkins in order to pursue educational opportunities and eventual reintegration into society without oversight by DHMH. Witnesses called included Ana Cervantes, M.D., the psychiatrist treating Mr. Hawkes at Perkins and Joanna Brandt, M.D., who, as experts called by Hawkes, testified regarding the issue of dangerousness. Dr. Cervantes opined that Mr. Hawkes "would not be a danger if released with the conditions proposed in our conditional release." Dr. Brandt concurred with this opinion, stating "[m]y opinion, to a reasonable degree of medical certainty was that Benjamin Hawkes would be at low risk for future dangerousness—as a result of a mental disorder—if released from confinement with the proposed plan and conditions."

Dr. Cervantes based her opinion on her experience treating Mr. Hawkes as well as a review of a Clinical/Forensic Review Board Case Report proposing conditions of release,[7] dated February 10, 2009, and three Psychology Risk Assessments (dated January 15, 2004, December 12, 2007, and February 19, 2009).[8] The 2004 Risk Assessment placed Mr. Hawkes in the

with the Health Department and notify the court and State's Attorney, in writing, of this request.

(2) The provisions of this title governing administrative hearing and judicial determination of eligibility for release apply to any application for release under this subsection.

**7.** A Clinical/Forensic Review Board Case Report, as explained in the introduction to the Board's Findings, is a report generated by a treating physician "for annual review and for approval" of a conditional release program. Mr. Hawkes's February 10, 2009 Clinical/Forensic Review Board Case Report was prepared at the request of Dr. Cervantes. The Clinical/Forensic Review Board is tasked with approving the recommendation contained in the Report, with the Clinical Director having signing authority over the final determination. Dr. Muhammed Ajanah, Clinical Director of Perkins, approved, on February 19, 2009, the recommendation that Mr. Hawkes be conditionally released.

**8.** The original Psychology Risk Assessment was conducted "to assist in evaluating [Mr. Hawkes's] future risk of violent recidivism." The updated assessments were conducted to "determine his current level of risk of violent recidivism, as well as aid the Clinical/Forensic Review

moderate "range" [9] for risk of future violence, based upon two actuarial instruments, the Violent Risk Appraisal Guide

---

Board in determining whether to recommend his approval for conditional release to an intensive/supervised residential program."

All three assessments used two tools to evaluate Mr. Hawkes's risk for violent behavior: the Violent Risk Appraisal Guide (VRAG) and the Historical/Clinical Risk Management 20–item scale (HCR–20). The VRAG was designed to "predict 'which offenders would commit at least one violent act, given the opportunity,' " while the HCR–20 was " 'developed to predict violent behavior in criminal and psychiatric populations.' " John Parry, *Criminal Mental Health and Disability Law, Evidence and Testimony* 377 (2009), quoting Erica Beecher–Monas & Edgar Garcia–Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post–Daubert World*, 24 Cardozo Law Review 1845, 1876–77 (2003). The use of both the VRAG and the HCR–20 involves assigning numerical values to a number of different factors—such as age at the time of offense, success or failure or previous attempts at release, and alcohol abuse, for example—and using the sum of those values to assign a label of low, moderate, or high risk to the patient being examined. Beecher–Monas & Garcia–Rill, 24 Cardozo Law Review at 1872, 1876–77. The VRAG involves consideration of only historical factors such as the level of violence of the act for which the patient was committed and the age of the patient at that time, *id.* at 1877, while the HCR–20 involves consideration of historical, clinical, and "risk management" factors, such as "exposure to destabilizers" and "stress." *Id.* at 1876 n. 215. Neither test explicitly takes into account conditions of release when assigning value to any variable. *See id.* at 1876–78 (listing the factors considered by each test, none of which include any consideration of conditions designed to ameliorate the risk of violence).

Both the VRAG and the HCR–20 have been criticized, however, because they cannot predict the future behavior of any specific individual. *Id.* at 1879–80 ("However, one cannot expect statistics to provide an answer about any particular individual. The most that can be said from even the best statistical analyses is that someone falls within a group that has a certain statistical propensity for violence.").

9. The "range" refers to the set of numerical values that correspond to a level of dangerousness. Under the VRAG scale, for example, scores from –24 to –8 reflect a "low" level of dangerousness, scores from –7 to 13 correspond to a "moderate" level, and scores from 14 to 32 indicate a "high" level of dangerousness. *See, e.g.,* Violent Risk Appraisal Guide, available at http://www.tn.gov/mental/policy/forms/MHDDvrag. pdf (downloadable VRAG risk assessment and range calculator).

The HCR–20 scale runs from 0 to 40, with a higher score associated with a higher risk of violence. *See, e.g.,* Douglass Mossman, *Violence Risk, Is Clinical Judgment Enough?*, Current Psychiatry, June 2008, available at http://www.currentpsychiatry.com/pdf/0706/0706CP_ Malpractice.pdf (downloadable article including a discussion of HCR–20).

(VRAG) and the Historical/Clinical Risk Management 20–item scale (HCR–20), that "combine a number of risk factors in order to achieve an overall 'score' that ranks levels of risk." Erica Beecher–Monas & Edgar Garcia–Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post*–Daubert *World,* 24 Cardozo Law Review 1845, 1872 (2003).[10] The notations in the 2007 and 2009 Reports indicate that "Mr. Hawkes' current risk would be considered to be *low.*"

Dr. Brandt based her opinion on the Case Report and Psychology Risk Assessments, as well as an interview she conducted with Mr. Hawkes prior to the hearing. Both doctors noted, however, that their opinions that Mr. Hawkes was not a danger to himself or others, were based on the conditions proposed by the February 10, 2009 Clinical/Forensic Review Board Case Report:

1. If discharged to the community, Mr. Hawkes will need a moderately structured treatment program. He should be monitored for medication compliance, be required to continue his substance abuse treatment including AA/NA groups and submit to random toxicology screening. He should also continue receiving individual psychotherapy, and continued participation in stress/anger

---

**10.** Mr. Hawkes's VRAG score was 5 and will not change, because the VRAG takes into account only historical factors, such as "age at the time of the initial offense; separation of either parent under age sixteen (except for death); failure on prior conditional release; nonviolent history score; never married (or equivalent); DSM III criteria for schizophrenia; serious victim injury; alcohol abuse score; [and] whether the victim of the index offense was female." Erica Beecher–Monas & Edgar Garcia–Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post*–Daubert *World,* 24 Cardozo Law Review 1845, 1877 (2003).

Mr. Hawkes's HCR–20 score was 19 in 2004 and 14 in 2007 and 2009. While the record does not reflect the particular factors that scored lower in 2007 and 2009 than in 2004, the HCR–20 takes into account the following "clinical" factors, which are subject to change: "lack of insight; negative attitudes; active symptoms of major mental illness; impulsivity; [and] unresponsive to treatment." Erica Beecher–Monas & Edgar Garcia–Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post*–Daubert *World,* 24 Cardozo Law Review 1845, 1876 n. 215 (2003).

management and coping skills groups. Additionally, it is recommended that Mr. Hawkes' mental status be regularly monitored and addressed, and more specifically, suicidal/homicidal thoughts or ideations.

2. Immediately and for a substantial period of time following his release, Mr. Hawkes should be supervised in a residential housing facility that has a 24–hour staff presence.

3. Mr. Hawkes may benefit from additional resources, including a mentor, vocational assessment, counseling and placement services.

The Report also detailed a plan for discharge that included specific facilities and groups in which Mr. Hawkes would be required to participate that would satisfy the recommended conditions:

Plan for discharge: Mr. Hawkes has been accepted for residential rehabilitation programming at Alliance, Inc. in Baltimore County. He will be placed in an intensive-level MISA (Mental Illness Substance Abuse) bed in a townhouse with 2 other roommates. A staff office is located in the townhouse. Staff is available 24 hours a day, seven days per week and he will see staff frequently throughout the day. Initially, he will not have privileges to engage in community activities independently. He will be monitored and assessed during this time of transition and will be granted privileges based on his adjustment and clinical status. His medications will be kept in a locked box and he will be monitored administering his own medication. Compliance/non-compliance will be documented by the Alliance staff. He will go [to] the Alliance, Inc. Psychiatric Rehabilitation Program five days per week, three days of which he will participate in structured MISA programming, two of the days he will participate in consumer-led dual-diagnosis groups at the Alliance program. He will be required to attend AA/NA at least 5 days per week. He will be assigned a case manager and a residential counselor. Mr. Hawkes will be seen for outpatient mental health treatment

at Keypoint, Inc., where a psychiatrist will see him monthly and a therapist weekly.

Stephen Siebert, M.D., an expert called by the State, testified that, in his opinion, "Mr. Hawkes would be a danger to himself or the person or property of others if released from confinement at this time with the proposed conditions of release that I was provided." Dr. Siebert based this opinion on his evaluation of the Case Report and Risk Assessments, as well as an interview he conducted with Mr. Hawkes prior to the hearing. He testified to the need for additional observation of Hawkes and the successful completion of another semester at Howard County Community College:

> under the conditions that I proposed and also that would include my testimony that there would be an additional period of observation with unsupervised privileges and successful completion of at least one semester at Howard County Community College, if all of those things happen, and all of the criticisms that I've made in the plan were changed, then I would likely have a different opinion. . . .

After considering the testimony of the witnesses and the documents detailing Mr. Hawkes's progression through treatment at Perkins,[11] the administrative law judge issued a twenty page Report on Release Eligibility, in which he made the following findings of fact:

 1. On December 4, 2001, the Court committed the Patient to the Department after a verdict of [Not Criminally

---

11. These documents were Mr. Hawkes's original commitment paperwork; an order of continued commitment dated September 4, 2001; Clinical/Forensic Review Board findings/recommendations, dated February 19, 2009; Clinical/Forensic Review Board Case Report, dated February 10, 2009; a psychology risk assessment report, dated January 15, 2004; two psychology risk assessment updates, dated December 12, 2007 and February 19, 2009; proposed findings, conclusions, and an order of conditional release; a letter from an assistant public defender to the superintendent of Perkins; a letter from an assistant attorney general to the State's Attorney for Howard County; the notice of the hearing; a letter from Alliance, Inc.; a report from Joanna Brandt, dated April 20, 2009; a copy of Dr. Brandt's CV; and treatment notes written by Mr. Hawkes's treatment staff.

Responsible] to two counts of the charge of First Degree Murder.

2. The Patient has a significant legal history including four prior arrests in November 1994, February 1995, March 1995, and January 1996 for drug, disorderly conduct and battery/assault related charges. He also has a history of non-compliance with the terms of probation.

3. The Patient has a long psychiatric history beginning at the age of twelve and was an inpatient at Springfield Hospital Center (Springfield) beginning on January 1, 2000 after he had been delusional, irrational, angry, and making threats to his parents. He was diagnosed with Schizoaffective Disorder, bipolar type, Post Traumatic Stress Disorder, and Polysubstance Dependence.

4. After two months of hospitalization, the Patient stabilized and on February 23, 2000 was discharged to the STARR program.

5. On July 28, 2000, he was discharged from that program due to alcohol use and was given a thirty day supply of medication and was referred to the Howard County Health Department. The Patient failed to follow up with treatment, however.

6. The Patient continued to use drugs and alcohol and, over the next six months, there were additional episodes of violent and threatening behavior by the Patient. He stopped taking all medication and treatment and gradually decompensated to the point where he could not hold a job or maintain any interpersonal relationships.

7. Just prior to February 10, 2001, the Patient began having panic attacks and left home to stay with a friend. He smoked marijuana and used alcohol and was extremely paranoid and experiencing auditory hallucinations. He eventually asked his family for help and on February 10, 2001, his father took him to Howard County General Hospital. The Patient was evaluated, but did not disclose his paranoia. He was given an anti-

anxiety medication and after approximately one hour, he left without being admitted.

8. On February 11, 2001, the Patient was still experiencing auditory hallucinations and was still extremely paranoid. He went to his parents' house where he saw his sister, her friend, his mother and a boarder who was living at the house.

9. Once inside the house, the Patient obtained a knife and stabbed his mother twelve times then stabbed the boarder, who was in another room, thirteen times. He then obtained a sledge hammer and struck his mother in the area of the left eye several times fracturing her skull. After he did so, he took a piece of his mother's brain matter and ingested it. He proceeded to then strike the boarder in the face with the sledge hammer several times. Both the boarder and the Patient's mother were killed in the attacks. The Patient's sister and her friend were not attacked by the Patient.

10. The Patient was arrested and charged immediately. He was taken to Howard County General and was evaluated and transferred to Perkins on February 12, 2001.

11. At Perkins, he was evaluated further and disclosed that he perceived hatred from his mother and that she and the other victim were involved in a conspiracy against him. He believed that his mother had supernatural powers and described her as a witch. He believed that he killed both victims for the good of the country and believed that he was in the right by doing so.

12. For the next several months, his judgment and insight were extremely poor and he was experiencing auditory and visual hallucinations. He tried to attack a staff member and ranged from extreme paranoid ideation to profound depression and remorse. He began to show an awareness of the delusional nature of his thoughts, however, and began to respond to medication.

13. The Patient's psychiatric history includes such symptoms as depression, suicidality, paranoid delusions, visual and auditory hallucinations, ideas of reference, threats of violence toward others, sexually inappropriate behavior, racing thoughts, and panic attacks.

14. By 2002, the Patient was transferred to a residential ward and was exhibiting minimal psychotic symptoms. He was extremely guarded and showed symptoms of a social anxiety disorder. His diagnosis at that time included Schizophrenia, paranoid type; Major Depression, single episode in full remission, Cannabis and Alcohol Dependence and Hallucinogen Abuse.

15. He began psychotherapy in 2002 and was beginning to discuss the crime, expressing appropriate guilt and remorse. By May, he was approved for transfer to a medium security ward. He indicated that he was "in no hurry to leave" the hospital. He became involved in numerous treatment activities and showed increasingly improved insight but was having adjustment problems and experiencing episodes of regressive paranoia and suspiciousness.

16. He remained on medium security status in 2003 and continued with treatment activities but was still having intermittent behavioral and mood issues. He decompensated significantly during this time with worsening depression, a sense of entitlement, irritability and anger. His medication was adjusted and he improved slightly.

17. By January 2004, the Patient was experiencing symptoms of depression and psychosis but these symptoms began to go into remission by March 2004. On March 24, 2004, he was approved for transfer to minimum security but by June 2004, these privileges were suspended because of various rule violations. While despondent at first, he accepted responsibility for his actions and regained minimum security privileges by July 2004. In October 2004, he experienced a reemer-

gence of symptoms and his medication was increased and his condition stabilized.

18. In 2005, he was generally stable without psychotic symptoms. In June 2005, he was approved for an increase in his minimum security privileges to Level II which included several supervised community trips without incident. He experienced a period of paranoia toward the end of 2005 but was able to process these feelings and to disregard them as a symptom of his disorder. His insight continued to improve along with his ability to recognize his symptoms.

19. By February 2006, his symptoms were in substantial remission. He was committed to his therapy, aware of the signs and triggers of his symptoms, and was committed to remaining abstinent from substances. His social skills and his ability to manage social anxiety improved markedly. In the spring of 2006, the Patient was granted Level III privileges and was allowed unsupervised trips into the community and increased contact with his family.

20. In 2007, he continued to be stable but experienced intermittent depression with suicidal ideation. He demonstrated coping skills, however, and was compliant with treatment and medication. He began taking college courses at Howard County Community College and did well socially and academically. He worked in the community at a local sub shop but was not particularly interested in working in the food service industry. He quit his job spontaneously when he began having issues with how he was being treated by staff and over pay issues.

21. In December 2007, the Patient was recommended for housing services but was not accepted by various providers because they did not have the resources to provide services to forensic patients. The Patient reacted by being alternately despondent and moody but

was ultimately able to deal with the rejection in an appropriate manner.

22. In 2008, the Patient was accepted for housing services at Alliance, Inc., in their Mental Health Substance Abuse (MISA) Program and for outpatient mental health services through Keypoint, Inc. He was recommended for conditional release in April 2008 and a hearing was schedule to consider it.

23. Just prior to the hearing, the Patient reported to his treatment staff that he had been going to the gym at Howard Community College between his scheduled classes despite that this activity was not authorized. Throughout the time that he was attending classes, he became aware of staff concerns over the amount of extra time that he was requesting to have on campus which he justified as needing for studying in the computer lab. In addition, questions had been raised after an extra pair of his underwear was found in his school supplies. When a meeting was held to discuss these issues, he manufactured an alternate story to explain the finding but failed to disclose, at that time, that he was going to the gym and took the extra underwear to change into after working out.

24. Following his admission regarding his unauthorized use of the gym, the decision concerning his conditional release was postponed indefinitely. The Patient was emotionally upset by the decision but expressed relief over the prospect of having the stress of the release postponed. The Patient endorsed passive suicidal ideation but not active suicidal ideation.

25. The Patient subsequently had other instances of minor rule breaking behavior. On one occasion, he signed out of the unit when he was not authorized to do so and on other occasions, he gave coffee to another patient and sold coffee to yet another patient. In July 2008, he had some problems with the patient he sold coffee to who was bullying weaker patients on the unit. This

incident escalated into a situation where the Patient dared the other patient to hit him in the face. The Patient was reminded to refocus on his own problems and to let staff handle the problems of the other patients.

26. There were no future rule breaking incidents but the Patient did have other incidents that caused his judgment to be called into question. In one instance, he received a necklace from a former female patient but could not accept it because of security regulations. He was initially upset and questioned hospital policy but was later willing to return it after having the policy explained to him.

27. The Patient continued to utilize therapy and was invested and active in his groups. He was exercising good judgment and was making sound decisions about choices with which he was confronted.

28. On December 31, 2008, he reported to staff that he was possibly experiencing a psychiatric symptom. He reported that he had been given McDonald's food by someone that he worked with in the Maintenance Department, felt ill afterwards and had difficulty sleeping for one night. He reported seeing unusual color changes in the food and stated that he had a fleeting thought that perhaps someone had tried to poison him. He quickly realized, however, that no one had reason to do so and realized that no one else who had eaten the food had gotten sick. He concluded that he was becoming anxious over the upcoming meeting regarding his release. He was given medication to help him with anxiety and there have been no further incidents of any symptoms.

29. The Patient has a mental disorder diagnosed as Schizoaffective Disorder, Bipolar Type, Cannabis and Alcohol Dependence in extended full remission in a controlled environment, Hallucinogen and Amphetamine Abuse in extended full remission. He also carries an

Axis II diagnosis of Personality Traits (Narcissism, Avoidant).

30. The Patient has utilized Level III privileges since spring 2006 and has participated in numerous community trips. He works in the Maintenance Department at the Hospital and is a highly regarded worker. He is seen in individual therapy, in discharge groups and a variety of rehabilitation groups. He also volunteers at the Maryland Food Bank and is enrolled in two non-credit courses at Howard Community College.

31. The Patient is presently prescribed the psychiatric medications quetiapine, 800 mg, sertraline, 200 mg, oxcarbazepine, 600 mg and bupropion SR 300 mg along with other medications for somatic issues and has been fully compliant with all aspects of treatment. He has gone a significant period of time without experiencing symptoms of his mental illness. His insight is good and he is able to identify symptoms of his illness.

32. The Patient is committed to treatment and understands what he needs to do to be successful in the community.

33. The Patient is currently not a danger, as a result of mental disorder, to himself or to the person or property of others.

The administrative law judge then discussed at length the evidence supporting these findings. He accorded significant weight to the testimony of Dr. Cervantes, because she was Mr. Hawkes's treating physician at Perkins and had spent much more time evaluating Mr. Hawkes than any of the other expert witnesses:

I must consider the fact that Dr. Cervantes has treated the Patient for a significant period of time and has had the opportunity to work with the Patient and to respond to the various issues that have occurred. In addition, Dr. Cervantes has had first hand knowledge of how the Patient has responded to issues of behavior and treatment and has a better gauge of the likelihood of the Patient's successful

release with the conditions that she helped create. Accordingly, I must defer to Dr. Cervantes' clinical observations, conclusions and insight regarding the Patient.

He, finally, recommended that Mr. Hawkes be released, subject to sixteen conditions:

1. The Patient shall reside at the Alliance, Inc., Residential Rehabilitation Program (9201 Philadelphia Road, Baltimore, Maryland 21237, (410) 574–7700) or in any other housing approved by the [Department of Health and Mental Hygiene]. He shall comply with all of the housing provider's rules and requirements and he shall discuss any proposed changes in residence or a change in level of supervision with his mental health treatment provider including the residential rehabilitation provider's staff. Thereafter, any change in the Patient's residence or his level of supervision must be approved in writing by the Patient's mental health and residential rehabilitation providers and notice of the change sent to the Department's Community Forensic Aftercare Program (CFAP) prior to the change.

2. The Patient shall be seen for mental health treatment by a psychiatrist and a therapist at the Keypoint, Inc., outpatient mental health clinic (7702 Dunman Way, Baltimore, Maryland 21222, (410) 282–1792). He shall be seen monthly by his treating psychiatrist and weekly by his mental health therapist. He shall comply with all treatment recommendations as directed by his psychiatrist and therapist. Thereafter, any change in therapist, clinic or frequency of appointments must be approved in writing by the current therapist and sent to the CFAP prior to the change.

3. The Patient shall take all psychiatric medications as prescribed by his psychiatrist and shall comply with treatment recommendations and monitoring of medications as requested by his psychiatrist. He shall participate in all laboratory tests ordered by the prescriber, including blood tests, to monitor or confirm the levels of

medication, if requested. He shall agree, if necessary, to pay the cost of analysis of samples.

4. The Patient shall attend and participate in the Alliance, Inc., MISA Psychiatric Rehabilitation Program (8201 Philadelphia Road, Baltimore, Maryland 21237, (410) 574–7700) five days per week or as often as deemed necessary by his mental health and residential rehabilitation providers. He shall comply with the program's rules and requirements. His mental health and residential rehabilitation providers must approve any change in daytime activity in writing and notice of the change must be sent to the CFAP prior to the change. The Patient shall participate in all such additional programs and activities as may be recommended and arranged by his mental health and residential rehabilitation providers or by the CFAP. If the Patient is employed, the CFAP shall be allowed under this order to have contact with the employer.

5. The Patient shall not take illicit drugs or use alcohol. The Patient shall submit to medical procedures, as required by the CFAP, case manager, the Department or his mental health and residential rehabilitation providers, to monitor his use of illicit drugs and alcohol. The Patient shall agree, if necessary, to pay for such tests.

6. The Patient shall participate in substance abuse education groups as recommended by his mental health and residential rehabilitation providers. He shall attend AA and/or NA at a minimum of three times per week, or as often as deemed necessary by his mental health and residential rehabilitation providers. Any change in such recommendations must be made in writing and sent to the CFAP prior to the change.

7. The Patient shall not own, possess or use or attempt to own, possess or use a firearm or weapon.

8. The Patient shall immediately discuss with the therapist and will agree to abide by any resulting reasonable recommendation made in respect to the following:
 a. change in residence, employment or daytime activity
 b. change in marital status or family composition
 c. change in physical or mental health
 d. legal involvements
 e. trips outside the State of Maryland
 f. failure to meet a clinic appointment
9. The Patient shall immediately notify CFAP (410–724–3034) if any of the conditions listed in section 8 a-f occur. The Patient shall obey all laws and in the event he is arrested or convicted or receives a probation before judgment, he shall immediately notify his therapist and CFAP.
10. The Patient agrees that the Department will have the right to order an independent psychiatric evaluation at any time, and he shall participate in and fully cooperate with such an evaluation.
11. If the Patient's mental illness becomes active, he may seek voluntary admission to a mental hospital for the purpose of treatment. Any such hospitalization shall not be construed to be a violation of conditional release.
12. If the Patient's mental illness becomes active such that the treating mental health personnel recommend inpatient treatment and he is unwilling to be voluntarily admitted to a mental hospital, this shall be deemed a violation of conditional release.
13. The CFAP shall be permitted to communicate with any person, including the therapist, having knowledge of the Patient's clinical conditions, and shall be furnished with all documentation concerning the Patient's status that may be necessary to monitor his ongoing clinical condition. The Patient agrees to waive the confidentiality of his medical and psychiatric record and infor-

mation to the entities involved in monitoring and overseeing his conditional release.

14. The CFAP shall be responsible for monitoring the conditions of the individual's release, including notification to all of the necessary parties that will be expected to provide services to the Patient.

15. During the period of conditional release, five years, the Patient shall remain subject to the jurisdiction of the committing court, to the general supervision of the Department, and to the reasonable requirements of the Department pertaining to the conditions of the release.

16. If at any time within the five years of the conditional release the Patient does not comply with the conditions of release, the CFAP shall immediately notify the committing court and the Office of the State's Attorney and, after a hearing, the Patient may be recommitted to the Department. Md.Code Ann., Crim. Proc. § 3–121 (2008).

The State filed exceptions to the administrative law judge's report and recommendation; a hearing was held on those exceptions in the Circuit Court for Howard County on July 10, 2009. The primary basis asserted by the State for vacating the decision of the administrative law judge and denying Mr. Hawkes a conditional release was that the only testimony produced at the administrative hearing was that Mr. Hawkes presented a low to moderate risk of violence, and, therefore, the administrative law judge's finding that Mr. Hawkes "is currently not a danger, as a result of mental disorder, to himself or to the person or property of others" was not supported by substantial evidence.

After the hearing, the judge issued a written decision and order in which she ruled that the administrative law judge's finding that Mr. Hawkes would not be a danger to himself or others was not supported by substantial evidence and ordered Mr. Hawkes's continued confinement. Her conclusion was based on the Clinical/Forensic Review Board's Findings and Recommendations (dated February 19, 2009), the Clinical/Fo-

rensic Review Board's Case Report (dated February 10, 2009), and Psychology Risk Assessments (dated January 15, 2004, December 12, 2007, and February 19, 2009). Because there was *some* risk of violence, as reported in both clinical risk assessments and noted by all three testifying doctors, the judge ruled that Mr. Hawkes was not eligible for conditional release: [12]

The Court finds that the evidence presented to the ALJ clearly shows that Petitioner presents some risk for violence and is a danger to himself or others, as a result of his mental illness. Even if Petitioner presents a low or moderate risk of violence, he is still not eligible for conditional release. Pursuant to Md. Code Ann., Crim. Pro. § 3–114(c), Petitioner is eligible for conditional release only if he would not be a danger, as a result of his mental disorder, to himself, others, or the property of others. Based on the evidence presented to the ALJ, including Petitioner's psychiatric and clinical history and risk assessment, it is clear that Petitioner poses a danger to himself and others.

Although the Review Board describes Petitioner's risk assessment as moderate to low, this description does not satisfy § 3–114 because Petitioner does in fact pose some risk or danger to himself or others. Further, Petitioner's historical pattern of consistent non-compliance with rules and his failure to take prescribed medications when supervision over him is relaxed—coupled with his recent behavior over the past year—indicates that Petitioner poses a continued risk of danger.

---

12. The hearing judge also noted that Alliance, Inc., the residential housing provider specified in condition one, had withdrawn its offer to provide housing to Mr. Hawkes, which presented additional problems. She declined to remand the matter to the administrative law judge to consider whether there were other providers capable of meeting the conditions, however, because "there was not substantial evidence presented to support the [administrative law judge's] preliminary determination that [Mr. Hawkes] was eligible for release because he does not pose a danger, as a result of a mental disorder, to himself or to the person or property of others if released from confinement."

Mr. Hawkes appealed to the Court of Special Appeals, which, in an unreported opinion, affirmed the judgment of the Circuit Court. Mr. Hawkes's primary argument in that court was that the circuit court judge employed a *de novo* review of the record, rather than limiting her determination to whether there was substantial evidence to support the administrative law judge's conclusion. The State responded, of course, that the circuit court judge had properly applied the correct standard of review.

The Court of Special Appeals did not engage in a substantial discussion of the issue of dangerousness, but agreed with the reasoning of the circuit court judge that because Mr. Hawkes's risk assessments indicated that he posed a "low to moderate risk for violent recidivism," he "would pose some danger to the community," and, thus, could not satisfy the requirement of 3–114(c) that he would not be a danger to himself or others if "discharged":

We agree with the circuit court. Section 3–114(c) is pellucid on the criteria for release from confinement: "A committed person is eligible for discharge from commitment *only if* that person would *not* be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged." (Emphasis added.) What appellant characterizes as the circuit court's *de novo* review of the evidence was, rather, the court's fulfillment of its duty to ensure that the ALJ's decision was based upon substantial evidence.

The only evidence that appellant would not pose a risk to himself or others was the statement of Dr. Cervantes, but that statement was inconsistent with another part of her testimony in which she acknowledged that appellant presented a low to moderate risk for violent recidivism based upon certain historical factors, and was contradicted flatly by the findings in the risk assessment update. Like the circuit court, we cannot see how someone could satisfy the legal requirement that he pose *no* danger to the community when all the evidence confirms that he would pose *some* danger to the community. The record before the ALJ

lacked substantial evidence to support his findings; a reasonable mind could not have found that appellant did not pose a danger to himself, or to the person and property of others. The court's order denying appellant's release was not in error.

As Mr. Hawkes points out, however, and the State concedes, the analysis in the unreported opinion centered about that portion of Section 3–114 that establishes the standard for "discharge," where any level of risk is not tolerated, compared to conditional release, which requires only that the patient seeking release not be a danger to himself or others if released subject to specified conditions, which brings us to the current issue.

■ Preliminarily, the State argues mootness because Alliance, Inc., specifically mentioned in the conditions, had withdrawn its offer to provide Mr. Hawkes residential rehabilitation services before the hearing in the circuit court. The State argues, therefore, that it is not possible for Mr. Hawkes to be released under conditions one and four, contained in the administrative law judge's opinion. Condition one provides for residential services at Alliance, Inc. Mr. Hawkes responds that the first condition contemplates a substitute provider of residential housing and that a suitable substitute had been found, Arundel Lodge, Inc.

Condition four requires five-day-per-week attendance at the Mental Illness Substance Abuse Psychiatric Rehabilitation Program, which is held at Alliance, Inc. Mr. Hawkes asserts that any argument involving condition four has been waived because it was never raised by the State in the proceedings below, relying on *State v. Bell*, 334 Md. 178, 638 A.2d 107 (1994). Even if waiver were not an issue, Mr. Hawkes argues that there is no evidence that Alliance, Inc. is unwilling to provide *treatment* services, because Alliance's withdrawal pertained only to *residential* services and asks that we reverse the judgment of the circuit court and reinstate the decision of the administrative law judge; in the alternative, Mr. Hawkes requests a remand of the case to the administrative law judge

for the limited purpose of determining whether a substitute service provider to Alliance, Inc. that meets the conditions can be found.

■ While it is true that mootness may obviate a review of an issue by this Court, *Public Defender v. State*, 413 Md. 411, 422, 993 A.2d 55, 62 (2010); *Hammond v. Lancaster*, 194 Md. 462, 471–72, 71 A.2d 474, 478 (1950), mootness prevents our review only when "the court can no longer fashion an effective remedy." *In re Kaela C.*, 394 Md. 432, 452, 906 A.2d 915, 927 (2006) (citations omitted). In the instant case, a remedy could be fashioned upon remand to the administrative tribunal. Condition one clearly contemplates that there may be another housing provider that may be acceptable:

> [Mr. Hawkes] shall reside at the Alliance, Inc., Residential Rehabilitation Program (9201 Philadelphia Road, Baltimore, Maryland 21237, (410) 574–7700) *or in any other housing approved by the [Department of Health and Mental Hygiene].* He shall comply with all of the housing provider's rules and requirements and he shall discuss any proposed changes in residence or a change in level of supervision with his mental health treatment provider including the residential rehabilitation provider's staff. Thereafter, any change in [Mr. Hawkes's] residence or his level of supervision must be approved in writing by [Mr. Hawkes's] mental health and residential rehabilitation providers and notice of the change sent to the Department's Community Forensic Aftercare Program (CFAP) prior to the change.

(emphasis added).

With respect to condition four, it is unclear from the record whether Alliance is available to provide treatment, through its Mental Illness Substance Abuse Psychiatric Rehabilitation Program, to Mr. Hawkes. While it is true that condition four expressly requires Mr. Hawkes's participation in an Alliance, Inc. program,

> [Mr. Hawkes] shall attend and participate in the Alliance, Inc., MISA Psychiatric Rehabilitation Program (9201 Philadelphia Road, Baltimore, Maryland 21237, (410) 574–7700)

five days per week or as often as deemed necessary by his mental health and residential rehabilitation providers. He shall comply with the program's rules and requirements. His mental health and residential rehabilitation providers must approve any change in daytime activity in writing and notice of the change must be send to the CFAP prior to the change. [Mr. Hawkes] shall participate in all such additional programs and activities as may be recommended and arranged by his mental health and residential rehabilitation providers or by the CFAP. If [Mr. Hawkes] is employed, the CFAP shall be allowed under this order to have contact with the employer[,]

Alliance's withdrawal of its offer to provide the residential services may not be a withdrawal of its offer to provide therapeutic services. On a limited remand, the administrative law judge may consider whether Alliance, Inc. is unwilling to offer Mr. Hawkes a place in its Psychiatric Rehabilitation Program; therefore, the issues presented are not moot.

 On the merits of the instant case, the State and Mr. Hawkes *agree* that when a committed patient petitions for conditional release under Section 3–114(c), any determination of whether he or she will be a danger to himself or others must take into account the conditions of release. Section 3–114(c) states that "[a] committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court." Section 3–114(c) had its genesis in 1967 House Bill 15, which amended Article 59 of the Annotated Code of Maryland (1957, 1964 Repl. Vol.) to add Section 12, which stated:

If the Department of Mental Hygiene is of the view that a person committed pursuant to Section 8 or 11 of this Article (except during the first (90) days of commitment following a finding of not guilty by reason of insanity) not otherwise subject to release without condition, may be released on condition without danger to himself or to the safety of the person or property of others, it shall make application for

the release of such person in a report to the court by which such person was committed and shall present a copy of such application to the State's Attorney and the clerk of the court of the county from which the defendant was committed. The clerk of the court shall send a copy of such application to the last counsel for each such person. If the court is satisfied that the committed person may be released on condition without danger to himself or to the safety of the person or property of others, the court shall order his release on such reasonable conditions as the court determines to be necessary. If, within five (5) years after the conditional release of a committed person the court shall determine, after hearing evidence, that the conditions of release have not been fulfilled and that his continued release on conditions constitutes by reason of mental disease or defect a danger to himself or to the safety of the person or property of others, the court shall forthwith order him to be recommitted.

Chapter 709, Laws of Maryland 1967. These provisions, providing for the conditional release of committed individuals, predated the United States Supreme Court's decision in 1975, and its progeny, that made clear that the continued confinement of a person committed to a psychiatric hospital for a mental disease or disorder was not permissible beyond the time at which he or she no longer suffered from that mental disease or disorder. *O'Connor v. Donaldson*, 422 U.S. 563, 574–75, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396, 406 (1975) ("Nor is it enough that Donaldson's original confinement was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." (citations omitted)); *see also Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435, 451 (1972).

Section 3–114, in its entirety, states:

(a) *In general.*—A committed person may be released under the provisions of this section and §§ 3–115 through 3–122 of this title.

(b) *Discharge.*—A committed person is eligible for discharge from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged.

(c) *Conditional release.*—A committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court.

(d) *Burden of proof.*—To be released, a committed person has the burden to establish by a preponderance of the evidence eligibility for discharge or eligibility for conditional release.

Section 3–114 contemplates different standards for seeking a discharge rather than for seeking a conditional release. To be able to be discharged under subsection (b), the patient must show that he would not be a danger to himself or others absent any oversight by the government. Subsection (c), the applicable section in the case before us, however, contemplates the release of a patient *subject to conditions imposed by the court.* The differentiation between discharge and conditional release is readily apparent when juxtaposed adjacent to each other:

(b) *Discharge.*—A committed person is eligible for discharge from commitment ☐*[only* if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if discharged. (emphasis added)

(c) *Conditional release.*—A committed person is eligible for conditional release from commitment only if that person would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement *with conditions imposed by the court.* (emphasis added)

The purpose of conditional release, "part of a continuing course of treatment," which we noted in *Bergstein v. State,* 322 Md. 506, 516, 588 A.2d 779, 784 (1991), supports the analysis that the elimination of all risk is not a precondition of 3–114(c). Requiring that a patient demonstrate that he or she

will be *no risk* for violence before being conditionally released eliminates conditional release as part of "a continuing course of treatment." Indeed, it would conflate the standard for discharge under subsection (b) with that conditional release under subsection (c) and render the latter a nullity, an inappropriate rendition of the statute. *See State v. Ray*, 429 Md. 566, 576, 57 A.3d 444, 450 (2012) (explaining that we read statutes to ensure that "no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory").[13]

In the instant case, the circuit court judge and the Court of Special Appeals considered only whether Mr. Hawkes posed any risk to himself or the community based on the clinical risk assessments, and the testimony derived therefrom, which did not take into account the conditions of release. In this, they erred, because the courts did not take into account the specific conditions articulated by the administrative law judge that were designed to mitigate any risk Mr. Hawkes posed as "part of a continuing course of treatment." *Bergstein*, 322 Md. at 516, 588 A.2d at 784. In so doing, the circuit court and Court of Special Appeals conflated the standard for conditional release and discharge in contravention of Section 3–114.

Our analysis shows that Mr. Hawkes is eligible for conditional release, but, as the State notes, conditions one and four

---

**13.** Our analysis comports with that of the United States Court of Appeals for the District of Columbia Circuit, when determining eligibility for conditional release under their statute at the time, D.C.Code Section 24–301 (Supp. VII, 1959), which authorized conditional release when "the individual 'is not in such condition as to warrant his *unconditional* release, but is in a condition to be *conditionally* released under supervision[.]' " *Hough v. United States*, 271 F.2d 458, 460 (D.C.Cir.1959). To be eligible for unconditional release under Section 24–301, a patient had to show " '(1) that such person has recovered his sanity, (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others. . . .' " *Id.* In *Hough*, the court held that a committed patient seeking a conditional release must convince the court that "the individual has recovered sufficiently so that *under the proposed conditions*—or under conditions which the statute empowers the court to impose 'as [it] shall see fit,'— 'such person will not in the reasonable future be dangerous to himself or others.' " *Id.* at 461 (emphasis added) (footnote omitted).

may not be able to be met because of Alliance, Inc.'s withdrawal of its services. Mr. Hawkes addresses this issue by arguing that we should simply vacate the decision of the Court of Special Appeals and reverse the decision of the circuit court, because, as his counsel proffered during oral argument, a substitute housing provider, Arundel Lodge, Inc., is willing to accept him. The record, however, is devoid of any information as to whether Arundel Lodge, Inc. offers the same services, and thus can meet the necessary conditions, as Alliance, Inc. It is, therefore, inappropriate for us to simply substitute Arundel Lodge, Inc. for Alliance, Inc. and allow Mr. Hawkes to be conditionally released to that facility.

Faced with this dilemma, Mr. Hawkes argues that we should remand the case to the administrative law judge on the limited issue of whether a housing provider that is capable of providing services that comport with the conditions as set forth by the administrative law judge can be substituted. The State takes the position that any remand order must address eligibility for conditional release rather than just the conditions, because the expert opinions were premised on Alliance, Inc. being the residential treatment provider. This argument is without merit, because a remand order limited to condition one, relating to residential rehabilitation services, and whether Alliance, Inc. could provide the treatment set forth in condition four is sufficient to meet the conditional release provision in Section 3–114.

The State, alternatively, argues that Mr. Hawkes's mental state may have changed; it asserts that the only proper resolution, therefore, is to remand the case in full.[14] To

---

**14.** Our authority to remand a case is contained in Maryland Rule 8–604(d)(1) (2013), which states:

If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing, or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower

require a full remand of the case, as the State wishes, would permit almost indefinite confinement for Mr. Hawkes, who four years ago became eligible for release upon conditions.

On remand, the issues that must be addressed are whether there is a housing rehabilitation provider that can meet condition one and whether Alliance, Inc. remains able to provide the psychiatric services required under condition four. If those conditions can be met, then Mr. Hawkes should be conditionally released from Perkins. If not, then Mr. Hawkes cannot comply with the conditions of his release and must return to Perkins, though he remains eligible to re-file for conditional release pursuant to the procedures set forth in the Title 3 of the Criminal Procedure Article.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY WITH DIRECTIONS TO REMAND THE CASE TO THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE STATE OF MARYLAND.**

HARRELL, ADKINS, and McDONALD, JJ., concur and dissent.

HARRELL, J., concurring and dissenting, which ADKINS and McDONALD, JJ., join.

I join the Majority opinion, except for its rejection of the State's plea that, on remand to the Administrative Law Judge ("ALJ"), the ALJ be allowed to receive and consider any evidence that may exist regarding whether Hawkes's mental state may have changed for the worse since the ALJ last considered Hawkes's petition on 27 April 2009 and the experts

court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court.

last evaluated his amenability to conditional release prior to that. Maj. op. at 135–36, 70 A.3d at 326–27. Given the nature of the diagnoses of Hawkes's many mental disorders (Maj. op. at 115–20, 121–23, 70 A.3d at 314–17, 318–19); the relative dependency of the level of his improvement on adherence to a regular drug regimen, among other treatments (Maj. op. at 115–23, 70 A.3d at 314–19); and the proven history of his potential for violence against others when he is not operating in an improved state, I consider it imprudent to foreclose a more contemporary assessment of his continuing eligibility for conditional release, especially because it has been over four years since the last "examination" of his status. The Majority opinion's surmise that to allow this evidence (if it exists) to be considered on remand "would permit almost indefinite confinement for Mr. Hawkes" is a bit hyperbolic. Maj. op. at 135–36, 70 A.3d at 326–27. The Majority opinion provides for the resolution of the limited controversy over the framing of the conditions of release. Determining whether Hawkes's mental state deteriorated meaningfully since 2009 should not take another four years. Thus, the Majority's exaggerated contemplation of "almost indefinite confinement" does not persuade me that the Court should "blind" the ALJ to Hawkes's current mental condition on remand.

Judge ADKINS and Judge McDONALD have authorized me to state they join in this opinion.